**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

GLEN SCHEINBERG,

    Plaintiff,                                               Case No.

v.

STORY TERRACE, INC.,

    Defendant.                                        JURY TRIAL DEMANDED

_____/

## COMPLAINT

Plaintiff, Glen Scheinberg, through the undersigned counsel, files this Complaint against Defendant, Story Terrace, Inc. ("Story Terrace"), and states as follows.

### INTRODUCTION

1. Story Terrace promises "[w]e turn life stories into books for the most important people on earth. You and your loved ones." In November 2023, Glen engaged Story Terrace to write a book about the brilliant life of his dying mother, Dr. Mary Witt. As Glen explained to Story Terrace at the time, Mary did not have long to live; she was suffering from a severe case of multiple sclerosis, rendering her almost completely paralyzed.

2. Glen wanted Mary's life story to be made into a book so it could be told to Mary's descendants. Glen's daughters would be too young when Mary passed to have the opportunity to meet her, much less know her. As Story Terrace would put it, Glen wanted his mother's story told to the "most important people on earth," his children and grandchildren.

3. When Mary learned that her life story and legacy would be preserved for her family, she was elated and relieved. It was her last wish in life.

1

4. Story Terrace failed her. Story Terrace dawdled for six months before even trying to interview Mary, ultimately letting her slip from this world without leaving her life story behind.

5. Story Terrace promised Glen it could preserve Mary's story prior to her passing. Story Terrace lied—it did not have an author who could take on the project all-the-while making Glen believe the opposite. Story Terrace's fraud caused Mary's life story to be lost forever to time. <u>Mary died knowing it</u>.

## JURISDICTION AND VENUE

6. The Court has original jurisdiction pursuant to 28 U.S.C § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

7. The Court has personal jurisdiction over Story Terrace pursuant to Puerto Rico's long-arm statute, codified at P.R. Laws Ann. tit. 32 app'x V, R. 3.1(a)(2), because Story Terrace purposefully availed itself of the privileges of doing business in Puerto Rico and could have reasonably anticipated being brought into this Court. Story Terrace (i) promised to deliver a product to Glen in Puerto Rico and failed to do so, causing injury to Glen in Puerto Rico; (ii) lied to Glen about its ability to deliver the product to Glen in Puerto Rico, causing Glen to detrimentally rely and incur damages in Puerto Rico; (iii) made several phone calls and sent numerous emails to Glen in Puerto Rico in furtherance of the scheme, and (iv) knowingly demanded and received payments made by Glen from Puerto Rico.

8. Venue is proper pursuant to 28 USC §§ 119 & 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**PARTIES**

9. Glen is a natural person of legal age and a citizen of Puerto Rico. His domicile is in Dorado, Puerto Rico

10. Story Terrace is a Delaware corporation with its principal place of business in Los Angeles County, California. Its registered agent is Legalinc Corporate Services Inc., whose address is 131 Continental Drive, Suite 305, Newark, DE 19713.

**GENERAL ALLEGATIONS**

11. In November 2023, Glen contacted Story Terrace to inquire about writing a book about his dying mother, Dr. Mary Witt.

12. Approximately one week after initiating conversations with Story Terrace, on December 5, 2023, Alex Evangelist, a Story Terrace Account Executive, reached out to Glen to ask whether he was still interested in this book and asked that they schedule a phone call.

13. Glen agreed, and he had a phone call with Alex that lasted approximately forty minutes.

14. Glen explained in detail to Story Terrace that Mary was suffering from a severe case of multiple sclerosis, rendering her almost completely paralyzed.

15. During this call, Glen explained that Mary's condition would require in-person interviews with Mary rather than Zoom and that Story Terrace would need to be able to act urgently to conduct the interviews because of Mary's circumstances.

16. Alex represented to Glen on the December 5, 2023 call that it had the resources to handle, and would have no problem tackling, this important project in the emergency time frame and under the conditions required.

17. Later that same day, Story Terrace charged Glen's credit card $1,670, and Alex sent Glen an order confirmation email in which she stated, "I am looking forward to seeing this through" and "your Project Editor will be your point of contact for the entire book-making process – from writer matching to printing."

18. Alex included an outline of the package Glen purchased from Story Terrace:

**Your Package!**

You have paid a $1670 deposit for your Novella Package with a Senior Writer.

It includes the following:

1 StoryTerrace questionnaire

- 10 hours of interviews with a professional writer in up to 4 sessions IN PERSON
- 20,000 words of text (approximately 90 pages)
- Inclusion of 40 photos
- One full round of revisions on your draft
- A professional proofread of your draft
- One full round of revisions on your design proofs
- Four editorial consultation sessions at key stages
- Four hardcover full-colour copies of your 115-125 page book
- Digital version of your book (PDFs)

**Your Payment Schedule**

5 Equal Monthly Payments by Subscription - You have four more payments of $1670 to make. These will be taken on the same day of the month over the next four months starting from 12/5/23.

19. The December 5, 2023 correspondence from Alex stated that the standard time to completion, meaning interviews, drafting, editing, and final publication, is seven months.

20. On December 6, 2023, Glen received correspondence from Adam Haibach, Project Editor, stating that he was assigned by Story Terrace to the project for Mary.

4

21. Adam would be the first of six different project editors to be assigned to the project for Mary.

22. On December 7, 2023, Glen had a ten-minute phone call with Adam, during which the requirement to conduct the interviews urgently was repeated to Adam.

23. There was no further follow up from Adam. Instead, on January 3, 2024, about a month after signing up with Story Terrace, Glen received an email from Adam stating that he is leaving Story Terrace and he is handing the project off to a new project editor on the project, Brandy Wallner, Senior Project Editor & US Writer Lead.

24. On January 4, 2024, Brandy sent Glen an email stating that she would provide an update by late next week. She did not.

25. On January 5, 2024, Story Terrace charged Glen's credit card another $1,670.

26. On February 5, 2024, Story Terrace charged Glen's credit card another $1,670, for a total charge of $5,010 thus far. At that point and despite charging Glen more than $5,000.00, Story Terrace had not yet told him that it had not yet conducted the interviews.

27. On February 12, 2024, more than two months since the initial engagement, Brandy finally admitted to Glen that Story Terrace did not have a writer local to Mary's location in New Jersey.

28. The next day, on February 13, 2024, Brandy told Glen that Story Terrace could complete the project but that it could take an additional five weeks or so to find a writer for Mary's project.

29. Notwithstanding, upon information and belief, Story Terrace did not conduct any search for writers until nearly two weeks thereafter.

5

30. On March 5, 2024, Story Terrace charged Glen's credit card $1,670, for a total amount paid of $6,680.

31. That same day, Glen asked Story Terrace why he was still being charged when no writer had been assigned and no milestones were being met.

32. Regardless, at that point, Glen could not turn to a different writing service as he believed Story Terrace was imminently going to assign a writer and conduct the interviews. Switching would have derailed the process and caused another delay of multiple months just to set up interviews.

33. Alex confirmed that Story Terrace would pause billing until a writer was found.

34. On April 3, 2024, Brandy emailed Glen to let him know that she would be leaving Story Terrace, and Mary's project would be passed on to a ***third*** different project editor, Kristin Francoeur, Senior Project Editor.

35. Brandy also reiterated that Story Terrace was still conducting its writer search.

36. That same day, Glen asked Kristin if she was available for a phone call.

37. On April 5, 2024, Glen and Kristin agreed to set up a conference call for April 11, 2024.

38. On April 9, 2024, Glen received an email from a ***fourth*** different project manager, Xiaofang Ma, Senior Project Editor, stating that Kristin had a family medical emergency and had to miss the phone conference they had scheduled.

39. Xiaofang, further stated "[a]s far as I know, she has already reached out to our ad-hoc writer search team and is working with them to find a writer for your project."

40. Another month later, on May 10, 2024, Glen requested that Story Terrace refund the $6,680 he had already paid Story Terrace at that time. This was an attempt to get Story Terrace moving and to conduct the interviews immediately.

41. This request worked, with mixed results. The next day, May 11, 2024, Glen received an email from a *fifth* different project manager, Elizabeth DiPietro, Global Editorial Manager, informing him that Story Terrace had assigned Rachel Arterberry to write Mary's book. Now it seemed the interviews would be completed in a few days. Glen was relieved that the interviews would be conducted before Mary passed.

42. Three days later, on May 14, 2024, Story Terrace charged Glen's credit card $1,670, for a total of $8,350.

43. On May 16, 2024, Glen received an email from Elizabeth informing him that Mary's project was being passed along again to a *sixth* different project manager, Marge Brown, Senior Project Editor.

44. Eleven days after a writer had been assigned and nearly six months after engaging Story Terrace's services, on May 21, 2024, Marge emailed Glen to inform him that Mary's book was beginning the interview stage. Rachel then conducted an introductory interview, one of the minimum four interviews Story Terrace requires to be able to complete a book.

45. Fifteen days later, on June 6, 2024, Mary passed away.

46. Mary hung on to life for more than six months for Story Terrace to complete her four interviews. Story Terrace knew Mary could pass at any moment, took on the emergency assignment, promised it could do it while knowing it could not because it did not have an author available, and then let six months, and Mary too, pass.

47. Glen informed Story Terrace about Mary's passing. He requested a refund of the $8,350 he paid Story Terrace.

48. On June 11, 2024, Marge emailed Glen stating, "[w]ith all the related matters you have to attend to, we have put your book project on a six-month hold. According to our terms and conditions, a refund is not available."

49. On June 12, 2024, Glen responded by repeating his request to be refunded.

50. Finally, on June 14, 2024, Glen received an email from Rutger Bruining, CEO and Founder of Story Terrace, in which he stated, "I'm truly sorry that we didn't manage to find a writer for your mother earlier and that as a result we weren't able to interview her more."

51. Rutger admitted that Story Terrace conducted nothing more than one introductory interview of Mary.

52. Mary's project was treated like a hot potato at Story Terrace, having been passed off to no less than *six* different project editors, showing Story Terrace's malicious and callous disregard for Glen's interests or Mary's legacy.

53. Story Terrace deceived Glen into entering into a contract with Story Terrace by assuring Glen that Story Terrace could quickly conduct 4 interviews with Mary for ten minimum hours to obtain her life stories before she died, and then complete a book of her life.

54. Story Terrace failed to provide Glen with a single benefit outlined in the Novella Package that he purchased, despite charging him $8,350 and inexcusably wasting over six months of time, allowing for Mary's passing before she could tell her life story.

55. Because of Story Terrace's actions, Mary's life story has been lost forever to time, and Glen will never be able to provide her descendants, including Glen's daughters, with her life story. Worse yet, <u>Mary died knowing her story was not preserved</u>.

56. All conditions precedent to the institution of this action, if any, have been performed, satisfied, waived, or excused.

## COUNT I
## BREACH OF CONTRACT

57. Glen reasserts paragraphs 1-56 as if fully set forth herein.

58. Glen entered into an agreement with Story Terrace in which Glen agreed to pay Story Terrace to urgently interview his mother, Mary, up to four times for a total of 10 hours and turn those interviews into a book memorializing Mary's life story.

59. From Glen's initial conversations with Story Terrace, Glen emphasized the medical condition Mary was in and that time was of the absolute essence.

60. Glen stressed Mary's medical condition to numerous employees at Story Terrace on multiple occasions and forewarned that it could lead to complications if Story Terrace did not complete the interview process urgently.

61. Story Terrace represented to Glen that it could complete Mary's interviews urgently. In fact, Story Terrace stated that their "standard timeline" to publication would take approximately five to seven months. Simply put, Story Terrace agreed that time was of the essence.

62. In breach of the agreement, Story Terrace failed to (1) timely assign a writer to Mary's book project; (2) timely begin interviewing Mary; and (3) perform any of the tasks Story Terrace agreed to perform as part of the Novella Package.

63. Pursuant to Article 1163 of the Puerto Rico Civil Code, a party is at fault when he or she omits the diligence required by the nature of the agreement and the surrounding circumstances. P.R. Laws. Ann. tit. 31, § 9315. In these cases, the other party may demand the at-fault party's liability and require payment of all damages reasonably foreseeable from the time of execution of the agreement. Id., P.R. Laws Ann. tit. 31, §§ 9331 & 9332.

64. Due to Story Terrace's breach of the agreement, Glen has forever lost the opportunity to have Mary's story memorialized for his children.

65. As a direct and proximate result of Story Terrace's breach of the agreement, Glen has suffered significant damages, including expectation value of the agreement and emotional distress, a contemplated harm under the agreement.

66. Story Terrace is liable to Glen for these damages.

67. In addition to damages, Article 1255 of the Puerto Rico Civil Code allows a party to resolve a bilateral agreement if the opposing party failed to comply with a primary obligation arising thereunder. P.R. Laws Ann. tit. 31, § 9823. Moreover, Article 1253 of the Puerto Rico Civil Code allows a party to a bilateral agreement to withhold performance, if the other party is in default. P.R. Laws Ann. tit. 31, § 9821.

68. In light of Story Terrace's breach of contract, Glen requested that it refund all amounts paid pursuant to the agreement, which Story Terrace refused to do.

69. Therefore, and in addition to damages, Glen requests resolution of the agreement and the return of all payments he made to Story Terrace.

## COUNT II
## BREACH OF FIDUCIARY DUTY

70. Glen reasserts paragraphs 1-56 as if fully set forth herein.

71. Glen placed his trust and confidence in Story Terrace to write a book telling the Story of his dying mother, Mary, that his children would be able to cherish for a lifetime.

72. Story Terrace, being fully aware of Mary's medical condition, knew of Glen's repose of trust and accepted Glen's trust and confidence, agreeing to take on the task of memorializing Mary's story for her descendants. Story Terrace knew that if it did not fulfill this sacred trust placed with Story Terrace, that Mary's story would be lost forever to time.

73. As a result, Story Terrace had a fiduciary duty to Glen.

74. Story Terrace breached its fiduciary duty to Glen by failing to (1) timely assign a writer to Mary's book project; (2) timely begin interviewing Mary; and (3) perform any of the tasks Story Terrace agreed to perform as part of the Novella Package.

75. Given Story Terrace's representation that it could complete the task of memorializing Mary's story in the form of a book, to Glen's detriment, he did not engage any other company to do so in time to interview Mary before her passing.

76. Due to Story Terrace's breach of its fiduciary duty, Glen has forever lost the opportunity to have Mary's story memorialized for his children.

77. As a direct and proximate result of Story Terrace's breach of its fiduciary duty, Glen has suffered significant damages, including emotional distress, among other damages.

78. Story Terrace is liable to Glen for these damages.

## COUNT III
## NEGLIGENCE

79. Glen reasserts paragraphs 1-56 as if fully set forth herein.

80. In accordance with Article 1536 of the Puerto Rico Civil Code, any person who, through fault or negligence causes injury to another, is obligated to redress any such injury. P.R. Laws Ann. tit. 31, §10801.

81. Story Terrace, being fully aware of Mary's medical condition, assumed a duty to act timely to interview Mary in order to memorialize her story for Glen and his young children, prior to her death.

82. Story Terrace breached its duty by failing to memorialize Mary's story prior to her death.

11

83. Story Terrace's breach of duty actually and proximately caused the loss of Mary's story and Glen's inability to preserve her story for himself and his children.

84. Story Terrace knew or should have known that if it breached its duty to act timely to memorialize Mary's story, that her story would be lost forever, and Glen would never have the ability to memorialize Mary's story.

85. As a result of Story Terrace's breach of duty, Glen has suffered substantial damages, including emotional distress, among other things, which damages Story Terrace is obligated to redress.

## COUNT IV
## DOLUS

86. Glen reasserts paragraphs 1-56 as if fully set forth herein.

87. Pursuant to Article 1164 of the Puerto Rico Civil Code, a party acts with dolus when deliberately and in bad faith breaching an existing obligation. P.R. Laws Ann. tit. 1164, § 9364. Dolus is also apparent when a party acts in bad faith in the formation or performance of a contract. Casco, Inc. v. John Deere Constr. & Forestry Co., 990 F.3d 1, 11 (1st Cir. 2021).

88. On December 5, 2023, Glen had a phone call with Alex, an Account Executive for Story Terrace, to discuss Story Terrace's production of a book memorializing the life of Glen's mother, Mary.

89. The call on December 5, 2023 lasted approximately forty minutes.

90. During this call, Glen explained to Alex that time is of the ultimate essence given Mary's life-threatening medical condition and that the interviews must be conducted in person.

91. Alex assured Glen that Story Terrace had the present ability to urgently interview Mary in person to complete the book of her life.

92. Glen reasonably and foreseeably relied upon Alex's representations that Story Terrace could urgently interview Mary to memorialize her life story and, on that reliance, entered into an agreement with Story Terrace to complete the project, foregoing the opportunity to engage other potential writers.

93. Story Terrace knew or should have known that it could not urgently obtain Mary's life story, since it did not have an author who could take on and complete the project.

94. Glen was damaged by Story Terrace's false representation of its ability to urgently obtain Mary's life story and by his reliance on that misrepresentation.

95. Glen would not have entered into the agreement, were it not for Story Terrace's false representation.

96. As a result of Story Terrace's fraud and dolus, Glen has suffered substantial damages, including emotional distress, among other things.

97. Per Article 1168 of the Puerto Rico Civil Code, Story Terrace is liable for all of these damages, regardless of whether they were reasonably foreseeable at the time of the parties' agreement. P.R. Laws. Ann. tit. § 9332.

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

98. Glen reasserts paragraphs 1-56, 57-66, and 88-99 as if fully set forth herein.

99. Story Terrace had a duty to act in good faith toward Glen while fulfilling the terms of the agreement. All contracts under Puerto Rico law are subject to an implied covenant of good faith and fair dealing. P.R. Laws Ann. tit. 31, § 8983; see also Cantellops v. Álvaro-Chapel, 234 F.3d 741, 744 (1st Cir. 2000). This duty of good faith applies to contract performance. Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 108-09 (1st Cir. 2001).

100. "In determining whether liability attaches in a particular instance [for breach of the duty of good faith], an inquiring court typically examines the totality of the circumstances." Punta Lima, LLC v. Punta Lima Dev. Co., LLC, 440 F. Supp. 3d 130, 154 (D.P.R. 2020) (citing New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 12 (1st Cir. 2002)). "Liability exists if, in light of all the surrounding circumstances, the party's actions appear arbitrary, deceitful, or animated by some improper purpose." Punta Lima, 440 F. Supp. 3d at 154.

101. As more fully set forth above, Story Terrace breached its duty of good faith to Glen by, among others: failing to (1) timely assign a writer to Mary's book project; (2) timely begin interviewing Mary; and (3) perform any of the tasks Story Terrace agreed to perform as part of the Novella Package, all the while representing to Glen that it had the ability to undertake and at the very least interview Mary before her passing.

102. As a result of Story Terrace's actions, Glen has been damaged, as more fully set forth above, and which damages Story Terrace is compelled to redress.

## COUNT VI
## PUNITIVE DAMAGES

103. Glen reasserts paragraphs 1-54 and 86-97 as if fully set forth herein.

104. Article 1538 of the Puerto Rico Civil Code provides that a plaintiff is entitled to punitive damages, when the tortfeasor's act or omission is made with dolus. P.R. Laws Ann. tit. 31, § 10803.

105. As more fully narrated above, Story Terrace incurred in dolus by making false representations to Glen to induce him to enter into an agreement with them, among other facts.

106. Because Story Terrace acted with dolus, Glen is entitled to an award of punitive damages, equal to any amount he will be awarded.

## COUNT VII
## ATTORNEY'S FEES

107. Glen reasserts paragraphs 1-56 as if fully set forth herein.

108. Under Puerto Rico law, an imposition of attorney's fees is proper to penalize a "losing litigant who, due to his stubbornness, obstinacy, contumacy, and insistence upon a behavior bereft of grounds, forces the other party to unnecessarily assume the bothers, costs, work, and inconveniences of a litigation." Domínguez Vargas v. Great Am. Life Assurance Co. of P.R., 157 P.R. Dec. 690, 706 (2002). Simply put, the imposition of attorney's proceeds when a litigant assumes a posture that forces the opposing party to incur unnecessary costs. P.R. Oil v. Dayco, 164 P.R. Dec. 486, 511 (2005); Torres Ortiz v. ELA, 136 P.R. Dec. 556, 565 (1994).

109. As more directly addressed above, Story Terrace has assumed a behavior that has forced this litigation. It began this state of affairs by falsely representing to Glen its capacity to complete Mary's book on an urgent timetable and thereby inducing him to enter into this agreement. Thereafter, and upon being timely informed of Mary's death—which precluded completion of her book—Story Terrace refused Glen's request for a refund, which forced Glen to file this action.

110. Consequently, Glen respectfully submits that he is entitled to an award of attorney's fees.

## DEMAND FOR A JURY TRIAL

111. Pursuant to Fed. R. Civ. P. 38(b)(1), Glen hereby demands that all issues raised in this Complaint be tried by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Glen respectfully asks the Court to enter judgment in his favor and to grant him the following relief:

1. Compensatory damages;

2. An award of punitive damages equal to the award of compensatory damages;

3. Pre- and post-judgment interest;

4. Attorney's fees, and

5. Any other relief available under law or in equity.

Dated: December 9, 2024

Respectfully Submitted,

**MONSERRATE SIMONET & GIERBOLINI, LLC**
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968
Tel. (787) 620 5300 | Fax (787)-620-5305

*/s/ Fernando J. Gierbolini-González*
Fernando J. Gierbolini-González
U.S.D.C.-P.R. No. 211,901
Email: fgierbolini@msglawpr.com
Richard J. Schell
U.S.D.C.-P.R. No. 305,811
Email: rschell@msglawpr.com

-and-

**MCINTYRE THANASIDES BRINGGOLD ELLIOT GRIMALDI & GUITO, P.A.**
1228 E. 7th Ave. Suite 100
Tampa, FL 33131
Tel. (813) 223-0000

Paul B. Thanasides (Florida Bar No. 103039)
Email: paul@mcintyrefirm.com
(*Application for Admission Pro Hac Vice Pending*)
Joshua L. Hawes (Florida Bar No. 117752)
Email: jhawes@mcintyrefirm.com
(*Application for Admission Pro Hac Vice Pending*)

*Counsel for Glen Scheinberg*